## ELIHU E. JACKSON AND OTHERS *vs.* SALLIE M. JACKSON.

*Proof of Marriage and Legitimacy—General Reputation—Instructions to the Jury—Evidence—Depositions.*

Marriage may be proved by general reputation, cohabitation and acknowledgement in all cases, except actions for criminal conversation and prosecutions for bigamy.

The declarations of deceased parents are competent evidence to prove the legitimacy of their children, as well as to prove their marriage at a particular time and place, but evidence that the man did not tell an intimate friend that he was married or had a child, is not admissible.

Where the evidence as to the general reputation concerning the marriage of the parties in question is conflicting, it is competent for the jury to find the reputation according to the evidence of the plaintiff, but it is error in such case to instruct the jury that upon the evidence the law presumes that the parties were lawfully married, and the burden of proof is upon the defendant to show that they were not. Every fact stated in the prayer might have been found to be true, and yet the jury might properly have refused to sustain the marriage, because there was evidence qualifying these facts and tending to throw discredit and suspicion upon the cohabitation between the parties.

If a marriage can be justly inferred from the facts, then the presumption is that it was lawfully contracted wherever it may have taken place, and it will make no difference if it be shown that by the law of the State where it was contracted, the same ceremony is not requisite which is prescribed by the law of this State. But the Court cannot take judicial notice of the law of another State, and no instruction to the jury concerning the same should be granted in the absence of evidence as to that law.

Where it is attempted to prove a marriage by a general reputation, cohabitation and acknowledgment, the instructions on the one side ought to put clearly before the jury the facts in evidence from which they would be justified in finding the marriage, and on the other side the facts should be stated which would justify them in refusing to so find.

A prayer asserting that, under the circumstances therein stated, the jury could not find a marriage from reputation, is erroneous in a case where there is other evidence to establish the marriage besides that bearing on reputation.

A prayer asserting that if the connection between the parties was illicit in its beginning, it will be presumed to continue to be of the same character, and that this presumption can only be overcome and the marriage established by other evidence than cohabitation, is erroneous because it does not specify what other evidence was required.

Where it is sought to prove a marriage by general reputation, the character of the woman for chastity, the circumstances under which the parties lived together, their conduct and declarations after their separation, the manner in which they were treated by their families and the community, may be taken into consideration by the jury. And evidence that the woman, after the separation, lived in a disorderly and disreputable manner is admissible.

A medical witness is competent to testify whether a certain woman had ever been delivered of a child before the one at whose delivery he was her attendant physician.

Declarations of a person, not shown by evidence *aliunde* to be related to a certain man, are not admissible to establish the relationship of a third person to him.

A witness cannot be asked whether, in his opinion, certain persons were married.

Where one party to a cause gives more than five days notice to the attorney of the other party that the testimony of non-resident witnesses will be taken at a designated time and place before a notary public, and the attorney of the other party attends the taking of the evidence, the depositions are admissible under Code, Art. 35, sec. 16.

Appeal from the Circuit Court for Dorchester County.

The appellee filed a petition in the Orphans' Court of Dorchester County, alleging that she was the only child of Richard Watson Jackson, late of said county, deceased, and asking for the grant of letters of administration on his per-

sonal estate. The appellants answered, denying that the petitioner was the lawful child of the said Jackson, who, they alleged, was never married, and died without lawful issue, and asked that administration be granted to one of his brothers or sisters, as next of kin. Upon the petition of the appellee the following issue was sent by the said Orphans' Court to the Circuit Court for trial: " Is Sallie Jackson, the petitioner in this cause, the only lawful child of Richard Watson Jackson, intestate, deceased, whose estate is sought to be administered upon ?" At the trial ten bills of exceptions were taken to the rulings of the Circuit Court, (LLOYD and HOLLAND, JJ.) The second exception was taken to the testimony of a medical witness who had attended Mary Morris, the mother of the appellee, before and after her alleged marriage, to the effect that she had never been delivered of a child before the one spoken of by the witness. The fourth exception was taken to the refusal of the Court to allow a witness to be asked, on cross-examination, if he had ever heard the reputation of the plaintiff's mother for chastity questioned or doubted before the time she lived with Watson Jackson as his wife. The other exceptions to the evidence are stated in the opinion of the Court.

The plaintiff offered the following prayers :

*Plaintiff's First Prayer.*—If the jury find from the evidence that R. Watson Jackson, during the period from the early part of the year 1870 to the early part of the year 1872, visited Mary Morris at her mother's house in Philadelphia, and that sometime between the first of February and the first of April, 1872, the said R. Watson Jackson and Mary Morris left the city of Philadelphia for a short period of time, and afterward returned to the house of said Mary Morris in said city, and stated to her parents and relatives that they had been married in Chester, Pa.; and if they further find, that from and after that time the said Mary Morris assumed the name of Mary Jackson, and that from and after June, 1872, or thereabout, the said Watson Jack-

son and Mary Jackson lived together and cohabited as man and wife at 1014 Vine street, Philadelphia, and elsewhere in said city, until the spring of 1873, and that during said period of time, to-wit, on or about the first of January, 1873, and while they were thus cohabiting together, a child was born to the said Mary Jackson, and that the said Watson Jackson engaged Mordicai Price, a practising physician, to attend Mary Jackson as his wife during her confinement and the birth of said child, and paid the said physician for his services, and that said child was afterward named Sallie Jackson, and is the plaintiff in this case; and if the jury further find, that the said Watson Jackson and Mary Jackson, together with the infant child aforesaid, in the spring of 1873, moved to Salisbury, Maryland, rented a house, and there resided together, ostensibly as man and wife, until the spring or summer of 1874, demeaning themselves toward each other as such, and were recognized in the community of Salisbury as man and wife, and held themselves out to the world as such, and that they or either of them stated to one or more citizens of Salisbury that they were married in Chester, Pa., then the law presumes that they were lawfully married, and the burden of proof is upon the defendants to show, by a preponderance of evidence, that the said Watson and Mary were never lawfully married.

*Plaintiff's Second Prayer.*—If the jury find the facts set forth in plaintiff's first prayer, then they are instructed that said marriage is legally presumed to have been duly and lawfully contracted according to the law of the place in which they may find that said marriage occurred, and if they find that such marriage occurred in the State of Pennsylvania, then the validity of such marriage is recognized in Maryland, even though the jury may not find that any religious ceremony was performed at such marriage, nor any license obtained therefor.

The defendants offered the ten following prayers:

*Defendants' First Prayer.*—The defendants pray the Court to instruct the jury that it is incumbent on the plaintiff to

prove to the satisfaction of the jury a valid marriage be-
tween Richard Watson Jackson and the plaintiff's mother,
and unless they shall so believe, their verdict must be for ·
the defendants.

*Defendants' Second Prayer.*—The defendants pray the
Court to instruct the jury, that unless they shall believe
from the evidence that there was a valid marriage between
Richard Watson Jackson and the plaintiff's mother, their
verdict must be for the defendants, even though they may
believe that the plaintiff is the daughter of Richard Watson
Jackson.

*Defendants' Third Prayer.*—The defendants pray the
Court to instruct the jury, that cohabitation and reputation
of marriage do not constitute or make a contract of marri-
age, but is only evidence from which the jury may presume
a contract of marriage, if not rebutted or overcome by
other evidence, but for the jury to find a valid marriage
between Richard Watson Jackson and the plaintiff's mother
on the evidence of cohabitation and reputation, the reputa-
tion of their marriage must be general and uniform and not
divided; and if they shall believe from the evidence in the
case, that the reputation of marriage between them was not
general, but was divided, then they cannot find a valid mar-
riage from such reputation.

*Defendants' Fourth Prayer.*—If the jury shall believe
from the evidence, that the connection between Richard
Watson Jackson and the plaintiff's mother was illicit or
without marriage in its commencement, it will be presumed
to continue to be of the same character, and in order to
overcome that presumption it is necessary to adduce other
evidence than cohabitation to establish their marriage.

*Defendants' Fifth Prayer.*—To infer or presume a valid
marriage between the plaintiff's mother and Richard Wat-
son Jackson from reputation of marriage between them, ·
that presumption must be founded on a general reputation
and not divided or singular opinion; and if the jury shall
believe from the evidence, that the reputation of said marri-

age was not general, but was divided, then they cannot presume a valid marriage therefrom.

*Defendants' Sixth Prayer.*—That in determining the value or weight of the declarations of marriage or not between the said R. Watson Jackson and the plaintiff's mother, as made by them or either of them, the jury must consider all the circumstances under which they were made.

*Defendants' Seventh Prayer.*—That if the jury shall believe from the evidence that R. Watson Jackson and the plaintiff's mother did say or declare that they were married in Chester, Pennsylvania, and did cohabit in Pennsylvania, and did there hold themselves out as married, then these facts and all of them of themselves do not constitute or make a valid marriage under the laws of Pennsylvania; and that in determining the weight or value of such declarations, cohabitation and reputation as evidence, the jury should take in consideration the circumstances under which they were made.

*Defendants' Eighth Prayer.*—The defendants pray the Court to instruct the jury, that while the jury may infer or presume a marriage from cohabitation, general reputation, declarations and acknowlegements of the parties, yet these facts do not constitute or make a valid marriage, and, that to presume or infer a marriage from such evidence, it should be clear of suspicion, based on a general and not a divided reputation; and if the jury shall believe from the evidence that R. Watson Jackson and the plaintiff's mother did live together as man and wife, and did so hold themselves out to the world and so declare, and there was repute of their marriage in the communities where they lived, yet, in determining or finding from this evidence whether or not they were married, they should take into consideration the reputation of the plaintiff's mother for chastity, the length of time they so lived together and held themselves out as man and wife, the manner and circumstances of their coming together as husband and wife and so living, the length of time they lived apart, their conduct, habits and circumstances

since their separation, the declarations of them or either of them during their separation, and the manner in which they were received and treated by their respective families and the society of the community in which they lived during the time of their cohabitation and the years of their separation.

*Defendants' Ninth Prayer.*—The defendants pray the Court to instruct the jury, that if there is no evidence of a valid marriage between the plaintiff's mother and R. Watson Jackson, except the evidence of cohabitation between them, their acknowledgements and the reputation of the marriage; and that if the jury shall believe that the plaintiff has undertaken to prove a valid marriage between the said R. Watson Jackson and the plaintiff's mother at Chester, Pennsylvania, in the year 1872, and according to the laws of Pennsylvania, it is incumbent upon her to show that such marriage was in all respects in conformity to the laws of Pennsylvania at the time and place alleged by the plaintiff; and if the jury believe that they have failed to prove the fact of marriage at the time and place alleged by them, then they cannot rely upon cohabitation and reputation of marriage to raise a presumption of marriage at some other time or place than that offered in evidence to them, if they believe they have offered any evidence of the time and place of that marriage. And the jury cannot infer or presume a marriage at the time or place so attempted to be proved, except by testimony that is clear and explicit and general and supported by other circumstances, nor by reputation for marriage that is divided and not general.

*Defendants' Tenth Prayer.*—The defendants pray the Court to instruct the jury that there is no sufficient evidence in this case of the fact of a valid marriage contract between Richard Watson Jackson and the plaintiff's mother, made in the spring of 1872, at Chester, Penn.

The Court granted the plaintiff's prayers, and granted the defendants' sixth prayer, as offered, and granted the first, second, fourth and fifth, with the following amendments by the Court:

The Court inserted in the first prayer, after the words "to the satisfaction of the jury," the words "facts from which," and after the words "a valid marriage," the words "may be presumed," and amended the second prayer by inserting after the words "believe from the evidence," "facts from which," and after the words "a valid marriage" inserted the words "may be presumed." The Court amended the defendants' fourth prayer by inserting after the words "from reputation," the word "alone." The Court amended the defendants' fifth prayer by inserting after the words "from reputation," the word "alone;" and the Court rejected all the other prayers of the defendants; to which action of the Court in granting the plaintiff's prayers, and in the amending of the defendants' first, second, fourth and fifth prayers, and the rejection of the third, seventh, eighth, ninth and tenth, the defendants excepted, and the verdict and judgment being for the plaintiff, this appeal was taken.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, PAGE, ROBERTS and BOYD, JJ.

*James E. Ellegood* (with whom was *John R. Pattison* on the brief), for the appellants.

· The first exception arises on the admission of the depositions taken in Philadelphia. This testimony was taken under the Act of 1888, 1 Code, Art. 35, sec. 16. On the call of the docket on April 23, this case was set for trial by consent of all parties for May 8th. On April 27th notice was given of the plaintiff's (appellee's) intention to take this testimony on the fourth of May, which was taken in Philadelphia, returned and filed May 7th (Record, page 12.) We submit that the whole proceedings were *irregular*, and t h a t the appellants were taken by *surprise.* Sec. 16 declares that depositions taken under it " shall be treated in all respects as if taken under a commission regularly issued by said Court, and shall be subject to like exceptions as testimony taken under commission." Therefore, all the

particularity is required in this "mode" as if taken under a commission. The "notice of not less than five days" takes the place of a commission, but in all other respects the modes are identical.

First, we ask if this statute is to be so construed as to take a party by surprise, allowing depositions taken and filed one day before trial under the statutory requirement of five days notice? If so, what becomes of the rule and practice requiring depositions to lie in Court, and "to be published in the same manner and form as has heretofore been the practice in the case of a commission from a Court of Equity." Code, Sec. 15, Art. 35. 2 Poe's Pleading, in speaking of "open commissions" and oral examinations, declares "that it is absolutely indispensable that *due and reasonable notice* be given of the time and place, etc." This is such a just principle and practice that no authority need be cited.

The second ground of irregularity and surprise is, that there were no interrogatories filed or served on the appellants. While a notice of time and place is not necessary in the taking of depositions under a commission, "actual or constructive notice should be given to the opposite party *in time* to enable him to exhibit cross-interrogatories before the commission is sent out." *B. & O. R. R. Co.* v. *State*, 60 Md. 458. Supplemental interrogatories were ruled out in *Mathews* v. *Dare*, 20 Md. 268 ; *Parker* v. *Sedgwick*, 5 Gill, 320. It was impossible for the appellants to know the nature of the testimony to be taken and to prepare cross-interrogatories, or rebuttal testimony. The depositions were taken Friday, May 4th, and immediately sent for filing, and filed on Monday, the seventh. Nor is the appearance of the appellants' attorney a waiver of any rights, as he appeared specially and noted objections to the mode and procedure, and for the special purpose of reserving their rights. There was no waiver, expressed or implied, of any rights. In the next place, the notice is irregular, as "It is a notice that the plaintiff will attend *in person or by attorney*." No

such right is given under the Code.    A party cannot compel the opposite party to attend in person.    " The depositions shall be treated in all respects as if taken under a commission regularly issued."    This practice · requires interrogatories to be filed.    Notice by filing interrogatories is a prerequisite.    60 Md. 458.    The notice under the statute supersedes the commission only, not the interrogatories. The second and third exceptions must fall with the first.

On the other exceptions and the prayers, the counsel relied on: *Boone* v. *Purnell,* 28 Md. 607 ; *Redgrave* v. *Redgrave,* 38 Md. 95 ; *Barnum's case,* 42 Md. 251 ; *Crawford* v. *Blackburn,* 17 Md. 53 ; *Denison* v. *Denison,* 35 Md. 361 ; *Dartmouth College case,* 4 Wheat. 518 ; *Wade* v. *Kalbfleisch,* 58 N. Y. 284 ; *Stewart & Carey on Husband and Wife,* 15 ; *Com.* v. *Stump,* 48 Pa. 53 ; 1 *Bishop on Marriage and Divorce,* sec. 266 ; *Jones* v. *Jones,* 48 Md. 403 ; *Dysart Peerage case,* L. R. 6 Ap. Cas. 514 ; *Yardley's appeal,* 75 Pa. St. 207 ; *Brinkley* v. *Brinkley,* 50 N. Y. 199 ; *White* v. *White,* 82 Cal. 127 ; *Cunningham* v. *Cunningham,* 2 Dow. P. C. 482 ; *Lapsley* v. *Grierson,* 8 Ct. Sess. (2 series) 61 ; *Clayton* v. *Wardwell,* 4 N. Y. 234 ; *Badger* v. *Badger,* 88 N. Y. 551.

*E. Stanley Toadvin* (with whom were *Geo. M. Bell* and *Alonzo L. Miles,* on the brief), for the appellee, cited *Williams* v. *Banks,* 5 Md. 199 ; *Waters* v. *Waters,* 35 Md. 546 ; *Walker* v. *Schindel,* 58 Md. 370 ; *Davis* v. *State,* 38 Md. 37 ; *Barnum's case,* 42 Md. 304 ; *Boone* v. *Purnell,* 28 Md. 607 ; *Redgrave* v. *Redgrave,* 37 Md. 93 ; *Richard* v. *Behm,* 73 Pa. St. 140 ; *Jones* v. *Jones,* 45 Md. 144 ; *Fornshill* v. *Murry,* 1 Bland, 482 ; *Copes* v. *Copes,* 7 Gill, 247 ; *Sellman* v. *Brown,* 8 G. & J. 54 ; *Jones* v. *Jones,* 48 Md. 400 ; *Hanan* v. *State,* 63 Md. 128 ; *Guardians of Poor* v. *Nathan,* 2 Brewster, 149 ; 2 *Poe's Pldg.,* sec. 303, *Wilson* v. *Merryman,* 38 Md. 330.

BRYAN, J., delivered the opinion of the Court.

An issue was sent from the Orphans' Court of Dorchester County, to the Circuit Court, in these words : " Is Sallie Jackson, the petitioner in this cause, the only lawful child

of Richard Watson Jackson, intestate, deceased, whose estate is sought to be administered upon." And it was ordered by the Orphans' Court, that upon the trial of the issue, Sallie Jackson should be plaintiff, and the decedent's brothers and his sisters and their husbands should be defendants. At the trial before the jury the plaintiff introduced a good deal of testimony tending to prove the marriage of her parents and her legitimacy. It was in evidence that Richard Watson Jackson was residing in Philadelphia, and that he and Mary Morris, who was residing there in February or March, eighteen hundred and seventy-two, went to Chester to be married, and after they returned, both of them stated that they were married. It was also testified that they acknowledged each other as husband and wife; that they cohabited together and were generally reputed to be married. It is not certain, from the testimony, at what time their cohabitation conmenced or when the child was born.

Evidence was also given of the declarations of Jackson and the reputed wife, who are both dead, that Sallie Jackson was their legitimate daughter; also of declarations to the same purport made by the mother of the reputed wife. On the other hand, the evidence in behalf of the defendants tended to prove declarations by Watson Jackson that he was not the father of Sallie Jackson, and declarations, both by him and the mother, that they were never married; that the reputation of the mother for chastity was bad, both before and during her cohabitation with Watson Jackson; that they were not generally reputed to be married, and that they separated sometime in eighteen hundred and seventy-four, and never lived together afterwards. It appears from the proceedings in the Orphans' Court, that Watson Jackson died in October, eighteen hundred and ninety-three. It does not devolve upon us to settle the disputed questions of fact arising on the evidence; it was for the jury to determine the credibility of the testimony, and to draw all legitimate inferences from it. We are limited to a review of the questions of law decided by the Circuit Court as they

are presented in the bills of exception.   These are ten in
number, and were all taken by the defendants.   They have
appealed, as the verdict was in favor of the plaintiff.

By the law of Maryland a valid marriage cannot exist
unless it is celebrated by a religious ceremony.   It is not re-
quired that the marriage should be proved by witnesses who
were present at the time ; but such facts must be proved, as
in the contemplation of the law will justifiy the inference
that a religious ceremony has been performed.   The declara-
tions of deceased parents are admitted as evidence to prove
the legitimacy of their children. *Craufurd* v. *Blackburn*, 17
Md. 49.   It was said in the *Berkley Peerage case* : " If the
father is proved to have brought up the party as his legiti-
mate son, this is sufficient evidence of legitimacy until im-
peached, and indeed it amounts to a daily assertion that the
son is legitimate."   This assertion of the legitimacy of the
son involves and implies the precedent condition that the
parents were lawfully married.   In *Copes* v. *Pearce*, 7 Gill,
247, the evidence of the legitimacy of the female petitioner
(Mrs. Pearce) consisted of the declarations of her reputed
father, Giles Copes, deceased, that he had been married to
her mother, and that she was his daughter; together with
the fact that she lived with him as his daughter before her
marriage, and proof that she was called " Sister Betsy," and
treated and recognized as a sister by the sons of a woman
whom he married after the death of her mother.   The
Court said : " The declarations of Giles Copes are full and
explicit with regard to his marriage and the birth of Eliza-
beth, the appellee ; and his whole subsequent conduct, and
the course and bearing of the brothers, is an entire corrob-
oration of them.   Nothing short of actual proof of marriage
and birth, by witnesses actually present, could be more con-
vincing and conclusive."   Marriage may also be proved by
general reputation.   *Boone* v. *Purnell*, 28 Md. 607.   In
most cases it is proved by general reputation, cohabitation
and acknowledgment.   This species of evidence is admissible
in all cases, except actions to recover damages for adultery

and indictments for bigamy. *Taylor on Evidence*, sec. 517 ; *Redgrave* v. *Redgrave*, 38 Md. 97. The probative force of such evidence will vary according to the circumstances with which it is connected. For the sake of illustration let us state a case. Suppose it is shown that a man and a woman lived together as husband and wife for many years, and continued this connection until it was dissolved by the death of one of them ; that their deportment on all occasions was that of married people ; that they acknowledged each other as husband and wife ; that they were received in society as such, and were generally so reputed and esteemed, and that to all external appearance their lives were upright, moral and irreproachable. This body of facts would lead any impartial mind irresistibly to the conclusion that they were married. The suggestion that they had been living in sin and dishonor would be justly rejected as irrational and scandalous. The necessary inference then would be that their union originated under the circumstances which the law required to make it valid. In *Vincent's appeal*, 60 Pennsylvania State Reports, 240, there were unusual and irregular features attending the cohabitation between a man and a woman ; but the facts of the case were of a peculiar character, and the Court thought that the pure fame and spotless reputation of the woman made it highly improbable that she would have consented to a lascivious connection, and they gave great weight to her exemplary conduct, in considering circumstances which otherwise would have been fatally suspicious. But men and women frequently live together in honorable matrimony who do not possess the virtues of the couple in the supposed case. Therefore, it cannot be held that all of the facts which we have enumerated are absolutely necessary to prove marriage. They would prove it in a very complete and satisfactory manner. Circumstances less favorable would also establish it, but not so conclusively. The lower the standard of rectitude of the parties, the less improbable would it be that they would lead a life of shame. And so we may say that the weaker the gen-

eral reputation of marriage, the less would be its effect in pro-
ducing the conviction that it really existed.    And matters
of suspicion, if not satisfactorily explained, would in propor-
tion to their gravity weaken the proposed inference, or might
defeat it altogether.

It is believed that the general principles governing this
branch of the law are well settled by the authorities.    But
there is sometimes considerable difficulty in applying them
to combinations of facts.    The plaintiff's first prayer accu-
mulates a number of facts relating to the acknowledgment
of marriage of the parties and to cohabitation and reputa-
tion ; with regard to reputation it required the jury to find
that they " were recognized in the community of Salisbury
as man and wife, and held themselves out to the world as
such, and that they or either of them stated to one or more
citizens of Salisbury that they were married in Chester,
Pa." Upon the finding of these facts it asserts that " the
law presumes that they were lawfully married, and the bur-
den of proof is upon the defendants to show by a preponder-
ance of evidence, that the said Watson and Mary were never
lawfully married." It does not require the jury to find
that there was a general reputation of their marriage.
They were recognized in the community of Salisbury by
some persons as husband and wife ; there was also evi-
dence that there was a general reputation in the community
in favor of the marriage ; on the other hand, there was evi-
dence that they had never been recognized as married by
the family of the man, and a witness testified " that there
was a divided opinion as to their being married ; that the
general opinion of those with whom he talked was that
they were not married." General reputation is of great
importance in determining the nature of the cohabitation,
and the question ought to have been submitted to the jury.
It would have been competent for the jury to find the gen-
eral reputation according to the evidence in behalf of the
plaintiff, or they might have found according to the evidence
on the other side.    But it is necessary that the reputation

from which marriage is to be inferred should be general and not divided or singular. *Barnum* v. *Barnum*, 42 Md. 297 ; *Jones* v. *Jones,* 48 Md. 391. The conclusion of the prayer is stated too strongly. The facts mentioned in the prayer, with the addition of general reputation, would have justified the jury in finding the marriage if they believed that it existed, but it was an error to say that these facts made the conclusion of law imperative in favor of a lawful marriage, and imposed on the defendants the burden of proving the negative. Every fact stated in the prayer might have been found to be true, and yet the jury might properly have refused to sustain the marriage, because there was evidence qualifying these facts, and tending to throw discredit and suspicion on the cohabitation between the parties. Mary Fuller testified that during the time of the cohabitation the plaintiff's mother stated that she was not married ; and there was also evidence that her reputation for chastity was bad, both before the cohabitation and during its continuance. There was also evidence that Watson Jackson, during the time of the cohabitation, said that the child was not his. It was also testified that before they separated he stated in the woman's presence " that they were never married, and she knew it," and that the woman made no reply. If the character of the woman for chastity was bad, one of the elements would be wanting which give weight to cohabitation as one of the proofs of marriage, because it would be evident that moral restraints would not prevent her from living in concubinage. And if both man and woman stated that they were not married, these declarations would be grave impeachments of the connection between them. If they stated the truth the inference of marriage would, of course, be impossible. The cohabitation important to be considered in cases of this kind, is that which in its character and circumstances is consistent with the matrimonial union. The jury must decide on the credibility of the testimony, and it was their province to decide the question of marriage according to the inferences, which, in their judgment, ought properly to be drawn from the evidence.

The plaintiff's second prayer is in these words: "If the jury find the facts set forth in plaintiff's first prayer, then they are instructed that said marriage is legally presumed to have been duly and lawfully contracted according to the law of the place in which they may find that said marriage occurred ; and if they find that such marriage occurred in the State of Pennsylvania, then the validity of such marriage is recognized in Maryland, even though the jury may not find that any religious ceremony was performed at such marriage, nor any license obtained therefor."

This prayer is founded on the first, and must fall with it. A general principle is correctly stated in it. If the marriage is justly inferred from the facts, then the presumption is that it was lawfully contracted wherever it may have taken place, and it will make no difference, if it be shown that by the law of the State where it was contracted the same ceremony is not required which is prescribed in this State. *Redgrave* v. *Redgrave*, 38 Md. 97. We, however, cannot take judicial notice of the law of Pennsylvania; if it was desired that it should have any influence in this case, it ought to have been proved in evidence. *Gardner* v. *Lewis*, 7 Gill, 378.

The first prayer on the part of the defendants, was as follows: "The defendants pray the Court to instruct the jury that it is incumbent on the plaintiff to prove to the satisfaction of the jury a valid marriage between Richard Watson Jackson and the plaintiff's mother, and unless they shall so believe, their verdict must be for the defendants." The inquiry was whether there was a valid marriage, and this prayer presents the question fairly to the jury. It was correct as an abstract proposition. But as an instruction applicable to the case, it was defective, because it did not inform the jury what was necessary to constitute a valid marriage. It left them to their own conjectures to determine what circumstances were necessary to its validity. The Court made an amendment which left the jury to find "facts from which a valid marriage may be presumed," but did not inform them what facts were required for the purpose.

In a case like the present, where it is sought to deduce a marriage from facts and circumstances, the instructions on one side ought to set clearly before the jury the facts in evidence, from which they would be justified in finding the marriage ; and on the other side the facts and circumstances should be stated which would justify them in refusing so to find.   The first prayer for the defendant in *Boone* v. *Purnell*, 28 Md. 618, is a good example of such an instruction.

The second prayer for the defendants and the Court's amendment of it are liable to the same objections as the first.   The defendants' third prayer was correct as an abstract proposition.   It asserted that under the circumstances stated in the prayer, the jury could not find a marriage from reputation.   But there was a good deal of other evidence for the plaintiff besides that bearing on reputation.   It would perplex and embarrass trials very much to permit such a mode of practice.   It is not right to instruct a jury that they cannot find a verdict from a portion of the evidence, and leave them in the dark as to what they ought to find from other portions competent to sustain a verdict.   It would be an easy matter in every contested case to select some portion of the testimony which, standing alone, would not authorize a verdict for the plaintiff; but it is his right that all of the competent evidence in his favor should be considered by the jury.   We do not question the right of a party to segregate a portion of the evidence, and obtain by a prayer the opinion of the Court upon its effect, as sanctioned by *Whiteford* v. *Buckmeyer*, 1 Gill, 127, and many other cases. But this right must be exercised in harmony with the other rules of practice, and is necessarily limited by their operation.   The fourth and fifth prayers are liable to similar objections, and the amendments made by the Court do not materially change them.   Upon the supposition that the connection between Watson Jackson and the plaintiff's mother was illicit at its commencement, it was incumbent on the plaintiff to show a subsequent marriage between them. *Barnum* v. *Barnum*, 42 Md. 297 ; although this may be

shown by indirect proof. *Jones* v. *Jones*, 45 Md. 156. But this is not the proposition of the fourth prayer. It asserts that under such circumstances, other evidence than cohabitation was necessary to establish their marriage, but does not specify what other evidence was required. In point of fact there was much more evidence; so the prayer gave no definite information to the jury. The sixth prayer is not in question. The seventh prayer seeks an instruction in respect to the law of Pennsylvania. There is no evidence in the record of the law of Pennsylvania, and we have already said that we cannot take judicial notice of it. The eighth prayer asserts that the jury should take into consideration "the reputation of the plaintiff's mother for chastity, the length of time they so lived together and held themselves out as man and wife, the manner and circumstances of their coming together as husband and wife and so living, the length of time they lived apart, their conduct, habits and circumstances since their separation, the declarations of them or either of them during their separation, and the manner in which they were received and treated by their respective families, and the society of the community in which they lived during the time of their cohabitation and the years of their separation." All these matters tended to show the nature of the connection between the parties, and were important in enabling the jury to determine whether the cohabitation was pure and innocent, according to the proprieties of married life, or whether it was licentious. If the appearances and circumstances indicated virtue and respectability, they would be favorable to the inference of marriage; but if they bore the marks of incontinence and depravity, the tendency would be to the contrary. It rested with the jury to decide the question. The ninth prayer was properly rejected. The declarations of Jackson and the plaintiff's mother, that they were married at Chester, were competent evidence to go to the jury to prove the marriage. For this reason the tenth prayer was also properly rejected. The Court granted the two prayers of the plaintiff, and re-

jected all of the defendant's in the form in which they were offered, except the sixth ; but granted the first, second, fourth and fifth with amendments.

We will now consider the exceptions to the rulings on the evidence. The first exception is to the admission of depositions taken in Philadelphia in behalf of the plaintiff. They were taken in accordance with the requirements of Article 35, section 16 of the Code, and after the notice therein prescribed had been given. The defendant's counsel was present at the taking of the testimony and cross-examined the witnesses. We see no objection to the depositions. The second exception was to the testimony of Dr. Price, given in answer to the eleventh interrogatory. The matter of inquiry was a question of medical knowledge, and the witness, a physician, was competent to testify as an expert. The third exception was to the following testimony given by Lettie A. Morris : " One thing I have thought of since I have been in this room. Why should he come forward and want this child ? He made the proposition to her grandmother to take her and educate her." She was speaking of a proposition which the mother of plaintiff's mother (who died two years ago) said had been made by Jackson. It is urged that this declaration is admissible to prove family relationship It is maintained that Jackson's offer to provide for the child was evidence of an acknowledgment of her on his part as his legitimate daughter, and that this declaration of the child's grandmother tends to prove the repute in the family of her legitimacy. Waiving all question about the remoteness of this declaration from the point in issue, we may state that the effort is to establish a relationship to Jackson, and this cannot be done by the declarations of a person who is not shown by evidence *aliunde* to be related to him. This point was distinctly adjudged in *Blackburn v. Crawford*, 3 Wallace (S. C.) Reports, 188. The evidence ought to have been rejected. The question asked of the witness in the fourth exception seems to have been disallowed, because it was leading. In the fifth bill of excep-

tions the defendnts proposed to ask a witness his opinion whether the parties were married. This was clearly incompetent. In the sixth the witness was asked whether he and his wife had recognized Jackson and the plaintiff's mother as husband and wife. Family repute and general reputation are evidence, but the individual opinions and recognition of two persons are not admissible. They were not even connected with the family. In the seventh exception a witness for defendant testified that she lived in a house about three yards distant from the one occupied by Jackson and the plaintiff's mother, and that " she heard whistling at night about the house, and saw men in the yard about the house at night, and that she would meet them sometimes as she was going to the well for water ; that the mother of the plaintiff had told her that she had a child in Philadelphia before she was married, and that she had disposed of it by putting it in the water pipes, and that it came before its time ; that she never saw a man go in the house ; but that on one occasion at night she saw a man come to the door, and plaintiff's mother met him at the door." She was then asked this question by defendants' counsel : " State under what circumstances and conditions you saw the party whom you speak of go to the door, and state what you saw on that occasion ?" The counsel for defendants stated, " that they proposed to show the conduct of the plaintiff's mother, and the suspicious character of the inmates of the house, and proposed to follow it up by frequent visits of men to the premises at night under suspicious circumstances." But on objection by the plaintiff the Court overruled the question. If the defendants could prove that the house was kept in a disorderly and disreputable manner, it would have a tendency to show that the intercourse between these parties was not of a virtuous kind. Similar testimony was tendered in the eighth exception, and for the same reason it ought to have been admitted. In the ninth exception the defendants offered to prove by a witness that he had never heard Jackson say that he was married or that he had a child.

This witness had already testified that he was very intimate with Jackson, and had talked with him on the subject of marriage. If Jackson had said that he had never been married, it would have been admissible in evidence, but we cannot see how his failure to make any statement on the subject can be evidence. The Court ruled against the de-fendants on all the questions of evidence which we have been considering. There was error in granting the plaintiff's two prayers and in refusing the defendants' eighth prayer, and in the rulings in the third, seventh and eighth exceptions to evidence.

*Rulings reversed and cause remanded for a new trial.*

(Decided December 18th, 1894.)